BAKER *v.* MOHL.

1. INTOXICATING LIQUORS—CIVIL-DAMAGE ACT—EVIDENCE—MORTALITY TABLES—DAMAGES—FUTURE DAMAGES.

   In an action against a saloon keeper under the civil-damage act (2 Comp. Laws, § 5398; 2 Comp. Laws 1915, § 7050), where the evidence showed that the illegal sales of liquor during the period covered by the declaration contributed to the making of plaintiff's husband a confirmed drunkard, causing him to lose his position and diminishing his earning capacity, which condition continued up to the time of the trial, the mortality tables were admissible in evidence.[1]

2. WITNESSES—CROSS-EXAMINATION—ABUSE OF DISCRETION.

   Where defendant kept a book with reference to his business, and, in his direct examination, testified as to an entry therein relating to plaintiff, cross-examination as to other entries was within the discretion of the court, and where no prejudice resulted to defendant there was no abuse of discretion.

3. INTOXICATING LIQUORS—DAMAGES—INSTRUCTIONS.

   The court properly instructed the jury that, as one element of her damages, plaintiff was entitled to recover for the shame, humiliation, and disgrace resulting from the drunkenness of her husband caused by the illegal sales subsequent to the date declared upon.

4. TRIAL—JURY—INSTRUCTIONS—COERCION OF JURY.

   Where the jury had been absent for 24½ hours without being able to reach a verdict and were called into court, and, without objection of counsel, were given further instructions as to their duties, but were advised that they should not surrender a well-grounded conviction, the claim that the verdict was the result of coercion on the part of the trial judge is untenable.[2]

---

[1] Upon the question of admissibility of mortality tables in evidence, see note in 40 L. R. A. 553.

[2] As to effect of coercion of disagreeing jury by the court, see note in 16 L. R. A. 643.

5. INTOXICATING LIQUORS—DAMAGES—EXCESSIVE VERDICT.
    Where the evidence showed that the earning capacity of
        plaintiff's husband had decreased by reason of the illegal
        sales, and her loss in his contributions to her during the
        time alleged was greater than the amount of the verdict,
        it cannot be claimed that a verdict of $1,000 is excessive.

6. NEW TRIAL—MISCONDUCT OF JURY.
    While the proceedings in the jury room should be kept
        secret, mere rumors and gossip as to disclosure of pro-
        ceedings of the jury is insufficient to warrant the court
        in granting a new trial.

Error to Kent; Perkins, J.   Submitted April 17,
1916.  (Docket No. 74.)   Decided June 1, 1916.

Case by Ida Baker against John Mohl and another
for damages under the civil-damage act.   Judgment
for plaintiff.  Defendants bring error.  Affirmed.

*McKenna & Herman* and *A. F. Bunting,* for appel-
lants.

*Rodgers & Rodgers,* for appellee.

Plaintiff in this case brings her action against de-
fendant Mohl, a saloon keeper, and his surety, under
the provisions of the so-called civil-damage act (sec-
tion 5398, 2 Comp. Laws; 2 Comp. Laws 1915, § 7050).
The declaration charges the defendant Mohl with hav-
ing made illegal sales of intoxicating liquors to John
W. Baker, the husband of the plaintiff, between May
1, 1910, and December 17, 1914, the date of the filing
of the declaration, with consequent injury to plaintiff
in person, property, and means of support.  Defend-
ants filed several pleas of the general issue.
Upon the trial it appeared that plaintiff had been
the wife of John W. Baker since 1884, and that said
Baker had been employed by the American Laundry
in the city of Grand Rapids for 29 years prior to the
19th day of September, 1911, upon which day he

was discharged. The record fairly shows that for many years prior to his discharge in 1911 John W. Baker had been a man habitually addicted to the excessive use of intoxicating liquors. It seems, however, that he was able to and did perform the duties of his employment with satisfaction to his employer up to the time of his discharge, although in the months immediately preceding his discharge his lapses from sobriety seem to have been more frequent. He received during the last few years of his employment with the American Laundry the sum of $23 a week. Plaintiff testified that of this sum she usually received from $15 to $18 per week, except during the last year of such employment, when he contributed to her from $7 to $15 per week. After losing his position with the laundry company in September, 1911, plaintiff's husband sought and obtained numerous other jobs, interspersed with occasional spells of idleness. The earnings of said John W. Baker were much reduced after his discharge by the laundry company, and his contributions to his wife very much less than they had formerly been. The record discloses the fact that after plaintiff's husband was discharged he took treatment at the Keeley Institute in Grand Rapids in an attempt to break himself of his unfortunate habit. He very shortly thereafter, however, commenced drinking again, and at the time of the hearing was apparently a confirmed inebriate.

It was the claim of the defendant Mohl, supported by testimony to that effect, that no illegal sales had been made to John W. Baker during the period covered by the declaration. This disputed question of fact, however, was determined in favor of the plaintiff, and a verdict was rendered in the sum of $1,000. Defendants now review the case in this court under 40 assignments of error, which are grouped for argument under five heads:

"(1) Error in ruling on admissibility of evidence.

"(2) Error in instructing the jury.

"(3) Error in keeping jury out for so long a period and in refusing to discharge them after the officer had disclosed their deliberations to the judge and other persons.

"(4) Error in refusing to give the defendants' requests to charge.

"(5) Error in denying defendants' motion for a new trial, and the reasons therefor."

BROOKE, J. (*after stating the facts*). 1. The first error discussed under this subdivision is the ruling of the trial court under which the mortality tables were admitted in evidence. The claim is made that the mortality tables are admissible only in cases of permanent injury, or where suit is brought by the representatives of a deceased person—citing *Mott* v. *Railway Co.*, 120 Mich. 127 (79 N. W. 3) ; *Sax* v. *Railway Co.*, 125 Mich. 252 (84 N. W. 314, 84 Am. St. Rep. 572) ; *Leach* v. *Railway*, 125 Mich. 373 (84 N. W. 316) ; and *Foster* v. *Village of Bellaire*, 127 Mich. 13 (86 N. W. 383).

It is asserted that the record clearly shows that John W. Baker on the 1st day of May, 1910, was already addicted to the excessive use of intoxicating liquors, and that he was not reduced to that condition by any act of the defendant; that when the case was tried on March 31, 1915, Baker was no more a confirmed drunkard than he was for years; that he was still alive and enjoying good health so far as the record in the case shows, and was able to work, and was at that time employed steadily, according to his own testimony. It is urged that there is no evidence in the record tending to show that Baker's health is affected; that his strength is diminished; that his habit of drinking intoxicating liquors is permanent; that it is incurable; that he is unable to work; or that his wife will suffer in her means of support in any way in the future.

We are unable to agree with the contention of coun-

sel in this regard. While it is true that the record discloses that Baker was an excessive drinker prior to May 1, 1910, it is equally true that his habits to that time had not prevented him from performing his ordinary labor and receiving therefor the sum of $23 per week. Indeed, this condition of affairs continued for about 1½ years thereafter; for he was not discharged from his position with the American Laundry until September, 1911. The record fairly shows that after May, 1910, and up to the time of the trial, the habits of plaintiff's husband became gradually worse. His periods of intoxication became more frequent and of longer duration. His ability or desire to labor was less and his earning capacity largely diminished. If, as charged in the declaration, this gradual diminution in the powers of John W. Baker, which certainly continued after May, 1910, and was plainly existent at the time of the trial, was contributed to by illegal sales of intoxicating liquors made by defendant Mohl during the period covered by the declaration, and the jury by their verdict have so determined, we can see no reason for the exclusion of the mortality tables. That the mortality tables are admissible in proper cases under the civil-damage act is clear. *Brockway* v. *Patterson,* 72 Mich. 122 (40 N. W. 192, 1 L. R. A. 708); *Merrinane* v. *Miller,* 148 Mich. 412 (111 N. W. 1050); and *Merrinane* v. *Miller,* 157 Mich. 279 (118 N. W. 11, 25 L. R. A. [N. S.] 585).

Error is assigned upon the ruling of the court with reference to the cross-examination of the defendant Mohl in the course of which it developed that Mohl had been sued on two other occasions under the civil-damage act. It appears that the defendant had a small book upon which he made entries with reference to the conduct of his business, which book contained an entry of the date upon which notice had been given him by plaintiff not to sell intoxicating liquors to her husband.

Plaintiff's testimony as to the date of her interview with defendant Mohl seems at variance with that claimed by the defendant. It further appears that earlier entries in the book in question were later in date than the one relating to the plaintiff. While the admission of other entries in the book than those affecting the case at bar may have been erroneous, we are not convinced that the broad discretion lodged in the circuit court to control the course of cross-examination was abused, nor (in view of the result) that the defendant was prejudiced. The case upon this point is somewhat similar to *Johnson* v. *Grondin,* 170 Mich. 447 (136 N. W. 423). See, also, *Totten* v. *Totten,* 172 Mich. 565 (138 N. W. 257).

The other assignments under this head have been examined, but require no discussion.

2. Assignments of error numbered 19 to 32, inclusive, are based upon the charge of the court as given, and refusal to charge as requested.

In assignments 19, 20, 21, and 22, certain portions of the charge are set out, and they are criticized by counsel for appellants because they say that the effect of the language used was to place the entire responsibility for Baker's condition in the past, present, and future during his entire expectancy of life upon the defendant. We do not think it necessary to quote the charge, which is very long, upon this question. It is sufficient to say that, read as a whole, the charge nowhere permits the plaintiff to recover any damages from the defendant except such as actually flowed from illegal sales made by the defendant after May 1st, 1910. The charge upon this point—the elements and the measure of damages—is within the rulings of this court. *Lucker* v. *Liske,* 111 Mich. 683 (70 N. W. 421); *Merrinane* v. *Miller,* 148 Mich. 412 (111 N. W. 1050).

The twenty-second assignment is directed to the charge of the court to the effect that, as one element

of her damages, plaintiff was entitled to recover for
the shame, humiliation, and disgrace resulting from
the drunkenness of her husband and his drunken hab-
its.    In connection with this point the court limited
the recovery in the following language:

"Another element of damages for you to consider, if
you find for the plaintiff, is for her mental suffering
caused by the disgrace and discomfort attending upon
the besotted condition of her husband, if you find such
a condition existed and that it will continue to exist,
subject, however, to the same conditions that I have
already given you.    If he was in a besotted condition
on the 1st of May, 1910, the plaintiff cannot recover
damages for the condition of her husband on that
date or prior to that date.    Her recovery must rest
entirely and exclusively upon what took place after
the 1st day of May, 1910, and the damages accruing
subsequent to that date."

We find no error in the instructions.  *Ford* v. *Chee-
ver*, 105 Mich. 679 (63 N. W. 975).

3. The record discloses the fact that after the jury
had been absent for about 24½ hours and had sent
word to the court that they were unable to reach a
verdict they were called into court, and the learned
circuit judge delivered to them further instructions
as to their duties as jurors to reach an agreement if
possible.  The instructions concluded as follows:

"Nevertheless, I would not have any one of you
come to a verdict, or assent to a verdict which was
contrary to your own judgment as to what is right and
just in this case.    You should act as individuals; yet
you should act together as well, and come to a con-
clusion if it is possible so to do."

These further instructions were given without ob-
jection, exception, or criticism on the part of defend-
ant's counsel.  The claim of counsel for appellants that
the verdict was the result of coercion on the part of
the trial judge is untenable.  The language used in
the supplemental charge was well guarded, and, while

impressing upon the jury the necessity for agreement, if possible, they were clearly advised that they should not surrender a well-grounded conviction.

4. Assignments of error based upon the refusal of the court to give defendants' requests to charge appear under this head. So far as they were proper, we find that they were fully covered by the charge as given.

5. Error is assigned upon the refusal of the court to grant a new trial for most of the reasons heretofore considered in this opinion. Added to these were the following:

(1) That the verdict was contrary to the great weight and preponderance of evidence.

(2) Because said verdict is excessive in amount. * * *

(9) Because the jury were permitted to disclose to the court officer what questions they were considering and how the vote stood.

(10) Because the court officer was permitted and did inform others about the court room regarding the deliberations of the jury, what questions they were considering, and how they stood several hours before the verdict was returned.

(11) Because the court officer was permitted and did inform others about the courtroom regarding the deliberations of the jury, what they were considering, and how they stood.

(12) Because the instructions of the court to the jury upon their return into the court room at 5:05 p. m., on April 8th, in view of his knowledge of their deliberations and how they stood, amounted to a coercion of a verdict from the jury.

The basic question of liability was hotly contested. Plaintiff and her witnesses gave positive testimony of actual illegal sales. Defendant and his witnesses as strongly denied the same. The question of fact thus raised was determined by the jury in favor of the contention of plaintiff, and we are not prepared to say

that the conclusion is against the weight of the evidence in such a sense as to demand a reversal upon the ground that the trial judge erred in refusing a new trial based upon that assertion.

Having in mind the earning capacity of plaintiff's husband prior to and during the year 1910, and up to September, 1911, and his decreased earning capacity and decreased contributions to his wife after that time, we are unable to see how it can be claimed that a verdict of $1,000 is excessive. If the testimony of the plaintiff was entitled to credence, she had lost much more than that amount in actual contributions from her husband between the 1st of May, 1910, and the time of the trial.

In an affidavit filed by counsel for appellant in support of a motion for a new trial, it is asserted that several hours before the verdict was rendered counsel for appellant had a conversation with the learned trial judge, who told him that he had been informed by the jury that they could not agree; that some were in favor of voting for 6 cents damage, and others of the jury were in favor of damages as high as $8,000; further, that M. L. Dunham and others who were engaged in a trial in the courtroom at the time had learned and informed deponent exactly how the jury stood and upon what questions they differed.

Bearing upon this question, the trial judge in his denial of the motion for a new trial said:

"It is not believed that the officer in charge of the jury unlawfully disclosed to any one their deliberations in the jury room; nor did the court know the state of their deliberations, except that they announced through such officer that they could not agree. It is true that more or less interest in the result was manifested by those remaining in and about the courtroom and in the corridors of the courthouse while the jury was considering the case, that more or less speculation was being indulged in as to the state of their deliberations,

and that the officer related to the court some of these rumors. Whatever conversation the court may have had with Mr. McKenna, of counsel for the defendants, during this time, could not and did not go beyond the repetition of these rumors. No significance or reliance was attached to or placed upon these rumors by the court, or any one else, so far as the court was aware. The jury were not kept out an unreasonable length of time, as defendants' counsel claims. According to the custom of this court, the jury were taken to a hotel between 10 and 11 o'clock in the evening, where they were given their usual night's rest, and did not resume their work until about the hour for opening court the following morning. During this time, however, they were under the care of two officers of the court. No message was received by the court from the jury until just immediately before the instructions were given admonishing them to agree upon a verdict if they could conscientiously do so. While these instructions were being given counsel for both parties were present in the courtroom, and no objection or exception was made or taken thereto. On receiving word through the officer that the jury could not agree, the court immediately consulted counsel for both the plaintiff and the defendants, who were present in court, as to the advisability of discharging the jury or giving them further instructions as to their duty and permitting them for a time to further consider the case. The latter course was apparently assented to by both parties, and the instructions were given."

It is unquestioned that the proceedings in the jury room should be kept secret. It is common experience, however, that during the protracted deliberations of a jury over their verdict in a hotly contested case speculation as to the result and gossip about the stand of the jury is rife. This speculation and gossip may sometimes have foundation in unwarranted disclosures made by the officer in charge of the jury. More frequently, however, we believe it to be mere idle gossip. In the case at bar we have the assertion of the learned trial judge to the effect that he did not have the in-

formation claimed to have been detailed by him to counsel for the appellant. With that assertion we are satisfied.

We find no reversible error in the record, and the judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and PERSON, JJ., concurred.